Adam T. Peterson (#033043)
apeterson@farhangmedcoff.com
Tyler B. Bugden (#035166)
tbugden@farhangmedcoff.com
**FARHANG & MEDCOFF**
100 South Church Avenue, Suite 100
Tucson, AZ 85701
Telephone: 520-214-2000
*Attorneys for Plaintiff*

Laura Belous (#028132)
lbelous@firrp.org
Rocío Castañeda Acosta (031173)
rcastaneda@firrp.org
**FLORENCE IMMIGRANT & REFUGEE RIGHTS PROJECT**
P.O. Box 86299
Tucson, AZ 85754
Telephone: 520-934-7257
*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Anayeli Pimentel Solar, as the widow of Benjamin Gonzalez-Soto, deceased, for herself and for and on the behalf of all other surviving statutory wrongful death beneficiaries of Benjamin Gonzalez-Soto, including JMGP, Maria Elena Soto Villalpando, and Gilberto Gonzalez Reyes,<br><br>                      Plaintiff,<br><br>          v.<br><br>United States of America; CoreCivic, Inc., a Maryland corporation; STG International, Inc., a Viriigna corporation; and Does 1-10, healthcare providers,<br><br>                 Defendants. | Case No. 2:24-cv-01517-SMM-JZB<br>**FIRST AMENDED COMPLAINT** |

FARHANG & MEDCOFF — ATTORNEYS

Plaintiff Anayeli Pimentel Solar, the widow of Benjamin Gonzalez-Soto, deceased, for herself and for and on the behalf of all other surviving statutory wrongful death beneficiaries of Benjamin Gonzalez-Soto, including JMGP (daughter), Maria Elena Soto Villalpando (mother), and Gilberto Gonzalez Reyes (father) (collectively "Plaintiff") for her Complaint against United States of America ("United States"); CoreCivic, Inc. ("CoreCivic"), STG International, Inc. ("STG"), and Does 1-10, healthcare providers (collectively "Defendants") alleges as follows:

## INTRODUCTION

1.      This action involves the egregious and unconscionably negligent or willful failure of the United States, CoreCivic, STG, and Does 1-10 to safely care for Benjamin Gonzalez-Soto ("Benjamin") while he was in their custody and care from July 1, 2022, until his wrongful death on July 8, 2022.  Despite Benjamin's multiple repeated pleas for help and obvious signs he was experiencing a medical emergency, the Defendants failed to consider that he might be experiencing something more severe and urgent than withdrawal, they overrode a medical hold and transferred him to a facility known to provide inadequate care, they failed to have him seen by a physician when necessary, and they failed to get Benjamin the emergency medical care he needed.  Defendants' treatment of Benjamin violated their own regulations, standards, policies, and rules.  Through these series of failures, the Defendants breached their duty to care for Benjamin and proximately caused his tragic and wrongful death.

2.      Before Benjamin died in the custody and care of the Defendants, he had been living and working in the United States, sending money home to his wife, Anayeli Pimentel Solar, and his daughter, JMGP.  He maintained a healthy and loving relationship with his daughter, and regular communication with his family, including his mother, Maria Elena Soto Villalpando, and his father, Gilberto Gonzalez Reyes.

3.      That regular communication continued until Benjamin was arrested and placed in the custody and care of the Defendants on July 1, 2022.  While in the custody and care of the Defendants from July 1, 2022, until his wrongful death on July 8, 2022,

Benjamin repeatedly complained of severe abdominal pain, nausea, and vomiting, and experienced dangerously elevated heartrates, rapid breathing, and dangerously low blood pressure that warranted consideration of a different diagnosis (other than withdrawal), a medical hold, and an immediate referral to the emergency room.

4.     The Defendants ignored these (and other) clear signs that Benjamin's condition was rapidly declining and he was in serious need of emergency medical care.

5.     By doing so, the Defendants violated the duties of care they owed Benjamin as jailers, their own contractual duties, standards of care for the transportation and detention of immigrants, and the prevailing standards of care in Arizona.

6.     Because the Defendants ignored these clear signs that Benjamin's condition was rapidly declining and that he was in serious need of emergency medical care, Defendants failed to refer Benjamin to the emergency room, denying him the chance for timely, life-saving medical intervention.

7.     After repeated pleas for help and days of enduring severe abdominal pain, nausea, vomiting, fainting, rapid breathing, elevated heart rates, and dangerously low blood pressure, Benjamin died a painful and preventable death on July 8, 2022.

8.     Plaintiff Anayeli Pimentel Solar accordingly brings this action for herself and for and on the behalf of all other surviving statutory wrongful death beneficiaries of Benjamin against the Defendants.

## JURISDICTION AND VENUE

9.     On January 12, 2023, Plaintiff served a Notice of Claim pursuant to 28 U.S.C. § 2675(a) and 28 C.F.R. § 14.2.  Those claims were denied by operation of law under 28 U.S.C.A. § 2675(a).  This Complaint is timely filed against the United States.

10.     This Court has subject-matter jurisdiction over the claims asserted against the United States under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 *et seq.*, pursuant to 28 U.S.C. § 1346(b)(1).

11.     This Court has subject matter jurisdiction over the claims asserted against CoreCivic, STG, and Does 1-10 pursuant to 28 U.S.C. § 1332(a)(2) because the amount

in controversy exceeds $75,000.00, exclusive of costs, and Plaintiff is a citizen of the United Mexican States ("Mexico").

12.    This Court has supplemental jurisdiction over the claims asserted against CoreCivic, STG, and Does 1-10 pursuant to 28 U.S.C. § 1367(a) because these claims are so related to the federal claim such that they form part of the same case or controversy under Article II of the United States Constitution.

13.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred within this judicial district, namely, in Florence, Pinal County.

## **PARTIES**

14.    Plaintiff Anayeli Pimentel Solar is Benjamin's widow and the mother of Benjamin's daughter, JMGP.  Anayeli Pimentel Solar is a citizen of Mexico.

15.    Anayeli Pimentel Solar brings these wrongful death claims on behalf of herself and all surviving statutory beneficiaries under A.R.S. § 12-612(A).

16.    JMGP is the minor daughter of Anayeli Pimentel Solar and Benjamin.  JMGP is a citizen of Mexico.

17.    JMGP is one of Benjamin's surviving statutory beneficiaries.  *See* A.R.S. § 12-612(A).

18.    Maria Elena Soto Villalpando is Benjamin's mother.  She is a citizen of Mexico.

19.    Maria Elena Soto Villalpando is one of Benjamin's surviving statutory beneficiaries.  *See* A.R.S. § 12-612(A).

20.    Gilberto Gonzalez Reyes is Benjamin's father.  He is a citizen of Mexico.

21.    Gilberto Gonzalez Reyes is one of Benjamin's surviving statutory beneficiaries.  *See* A.R.S. § 12-612(A).

22.    In a letter dated July 12, 2022, and addressed to Benjamin's father, the United States told Benjamin's father that Benjamin had died yet stated that the cause of death was "unknown."

23.     Defendant CoreCivic, Inc. (formerly known as Corrections Corporation of America) is a corporation formed in Maryland maintaining its headquarters at 5501 Virginia Way, Brentwood, Tennessee 37027.

24.     At all times relevant, CoreCivic was a for-profit prison contractor operating several detention facilities in the District of Arizona.

25.     At all times relevant, CoreCivic contracted with United States Immigration and Customs Enforcement ("ICE") and local governments to operate and manage immigrant detention facilities across the United States, including one in Florence, Arizona.

26.     CoreCivic owns and operates the Central Arizona Florence Correction Complex ("CAFCC") in Florence, Arizona.   CAFCC houses immigration detainees pursuant to an Intergovernmental Service Agreement (the "ICE-CoreCivic Agreement") with ICE.   Under the ICE-CoreCivic Agreement, CoreCivic personnel at CAFCC are required to provide security and medical care services to noncitizens detained and awaiting removal (deportation).  That agreement further requires CoreCivic to maintain compliance with ICE's Performance-Based National Detention Standards ("PBNDS").

27.     At all times relevant, CoreCivic was responsible for the actions, omissions, policies, procedures, practices, and customs of its various employees, agents, contractors, and agencies.   At all relevant times, CoreCivic was responsible for ensuring that its actions, omissions, policies, procedures, practices, and customs complied with the laws, regulations, and policies of—as well as its contractual agreements with—the United States and the States and municipalities in which it operates.

28.     Pursuant to the ICE-CoreCivic Agreement, CoreCivic was responsible for the custody and care of Benjamin from July 7, 2022, at approximately 5:17 p.m., until he died on July 8, 2022, at approximately 1:41 a.m.

29.     Defendant STG International, Inc. ("STG") is a corporation formed in Virginia maintaining its headquarters at 2900 S Quincy Street, Suite 888, Arlington, VA, 22206.

30.     At all times relevant, STG was a for-profit corporation providing staffing for

detention centers, including one or more detention centers in the District of Arizona.

31.    STG contracts with the ICE Health Services Corps ("IHSC") to provide medical services to noncitizens in federal custody at the Florence Service Processing Center ("FSPC"), a detention center owned and operated by ICE located in Florence, Arizona.

32.    At all times relevant, both IHSC and STG were responsible for providing medical services to noncitizens at FSPC.  Through IHSC, ICE contracted with STG for the provision of medical services at FSPC (the "ICE-STG Agreement").  Under the ICE-STG Agreement, STG was responsible for providing medical services that complied with certain laws, regulations, polices, and standards, including the PBNDS and the National Commission on Correctional Health Care Standards for Health Services in Jails ("NCCHC Standards").

33.    At all times relevant, STG was responsible for the actions, omissions, policies, procedures, practices, and customs of its various employees, agents, contractors, and agencies.  At all relevant times, STG was responsible for ensuring that its actions, omissions, policies, procedures, practices, and customs complied with the laws, regulations, policies of—as well as its contractual agreements with—the United States and the States and municipalities in which it operates.

34.    Pursuant to the ICE-STG Agreement, STG was responsible for the medical care of Benjamin from July 1, 2022, at approximately 11:32 a.m., until Benjamin was transferred from FSPC to CAFCC on July 7, 2022, at approximately 5:16 p.m.

35.    Defendant Does 1-10 employ corrections workers and/or medical service personnel in CAFCC.  Does 1-10 contract with CoreCivic for the provision of medical services to noncitizens awaiting removal by ICE at CAFCC.  At all times relevant, Does 1-10 were responsible for the actions, omissions, policies, procedures, practices, and customs of their various employees, agents, and agencies.  At all relevant times, Does 1-10 were responsible for ensuring that their actions, omissions, policies, procedures, practices, and customs complied with the laws, regulations, policies of—as well as its

contractual agreements with—the United States and the States and municipalities in which they operate.[1]

36.    Pursuant to one or more contractual agreements with CoreCivic and/or the United States, Defendant Does 1-10 were responsible for the medical care of Benjamin from July 7, 2022, at approximately 5:17 p.m., until he died on July 8, 2022, at approximately 1:41 a.m.

37.    Defendant United States detains noncitizens whom it believes to be in the country in violation of immigration law.  The United States, through ICE, contracts with municipalities and private corporations to house noncitizens and to provide certain services, like security and medical care.

38.    The United States oversees the management and operation of detention centers like FSPC and CAFCC where it houses noncitizens.  The United States oversees the management and operation of these detention centers to—among other things—ensure the private prison contractors and their employees and agents are following all applicable laws, regulations, polices (*e.g.*, IHSC Directive 03-13, 2021), clinical guidelines (*e.g.*, Federal Bureau of Prisons Clinical Guidance), and standards (*e.g.*, the PBNDS and the NCCHC Standards).[2]

39.    At all times relevant, the United States was responsible for the custody and care of Benjamin at FSPC and CAFCC.

40.    Each of the Defendants was, in some manner, responsible for the acts, omissions, and conduct that caused Benjamin's wrongful death.  Defendants are accordingly jointly and severally liable for Plaintiff's damages.

## **GENERAL ALLEGATIONS**

---

[1] Plaintiff is currently unaware of the true identities of these Defendants, but will amend the Complaint to name them with their true names as soon as their identities are ascertained.  Each of these Defendants is responsible in some manner for the acts, omissions, and conduct that led to Benjamin's wrongful death.

[2] *See Ice Detention Standards*, ICE.GOV, https://www.ice.gov/factsheets/ice-detention-standards (last visited May 15, 2024).

FARHANG & MEDCOFF — ATTORNEYS

41.    ICE took Benjamin into its custody and care on June 30, 2022, and placed him at the FSPC in Florence, Arizona on July 1, 2022, where ICE and STG were responsible for his care.

42.    He died at the CAFCC seven days later, on July 8, 2022, where ICE, CoreCivic, and Does 1-10 were responsible for his care.

43.    In the intervening seven days, Defendants[3] repeatedly violated their own rules, regulations, and standards, failed to consider differential diagnoses (other than withdrawal), failed to place Benjamin on a medical hold, repeatedly failed to recognize clear signs that Benjamin was experiencing a medical emergency, failed to make sure Benjamin was seen by a doctor after elevated vital signs, and repeatedly failed to refer Benjamin to the emergency department.  Despite Benjamin's severe pain, dangerous vitals, and constant pleas for different medical interventions, Defendants did nothing to save Benjamin's life.

44.    Defendants' failures denied Benjamin the opportunity for life-saving emergency medicine, proximately causing his wrongful death.

45.    Benjamin should have survived.  If he had been placed in the custody and care of a facility that met the baseline standard of care owed to detainees, he would have survived.  Instead, he suffered a painful and unnecessary death while in the custody and care of Defendants.

**A.    Defendants Failed to Care for Benjamin at FSF and FSPC.**

46.    On or about July 1, 2022, ICE Office of Enforcement and Removal Operations ("ERO") transferred Benjamin to the Florence Staging Facility ("FSF").  At approximately 11:25 a.m., Benjamin underwent a pre-screen evaluation by a Licensed Practical Nurse ("LPN").  His vital signs including heart rate, blood pressure, respirations and oxygen saturations were normal.

47.    On July 2, 2022, Benjamin was evaluated by a Physician's Assistant ("PA").

---

[3] As a reminder, "Defendants" includes the United States, CoreCivic, STG, and Does 1-10.

The PA noted Benjamin had last used drugs 4 days ago and that he was experiencing 4/10 pain.  The PA completed a Clinical Opiate Withdrawal Scale ("COWS") assessment, assigned Benjamin a score of 6 out of a possible 48, indicating only minor withdrawal symptoms, and prescribed clonidine (an antihypertensive), promethazine (an antiemetic), and ibuprofen to manage his symptoms.  The PA also ordered that COWS monitoring be completed three times per day.  The PA's note was countersigned by a doctor of osteopathy ("DO").

48.    On July 3, 2022, Benjamin was evaluated by a Nurse Practitioner ("NP") as an emergency.  Benjamin stated he was weak, had chills, nausea, and body aches.  Instead of sending Benjamin to a medical housing unit, ICE and STG transferred him to the Florence Special Housing ("FSH")—an administrative segregation unit—for close monitoring, to hold the Clonidine, and a follow-up appointment was scheduled with a provider for the following day.

49.    On July 4, 2022, Benjamin was seen by an RN and for the first time complained of 10/10 bone and epigastric/indigestion discomfort.  The RN continued to assess Benjamin's COWS score as mild (*i.e.*, 8 out of 48) and dispensed bismuth tablets.

50.    On July 5, 2022, at approximately 4:07 a.m., ERO transferred Benjamin to the Phoenix District Office for additional processing.  Upon his arrival back to FSPC at approximately 7:08 p.m., medical staff did not readmit Benjamin to the FSH, but rather returned him to the general population.

51.    On July 6, 2022, at approximately 10:00 a.m., Benjamin was seen urgently by a DO.  Benjamin complained of 10/10 chest pain along with body aches.  The DO performed an EKG and concluded the chest pain was likely musculoskeletal and the DO continued Benjamin on his then-current medications.

52.    Benjamin's pain did not dissipate and he was seen again by the DO for an urgent visit at approximately 1:00 p.m. with "20/10 pain", retching, actively attempting to vomit, and abdominal pain.  Benjamin was administered normal saline and ultimately escorted back to housing.

53.    At approximately 8:45 p.m., Benjamin was seen again by an RN at FSPC complaining of 10/10 body and stomach pains for the previous 1-2 days.  Benjamin reported his pain was aggravated by eating and he stated he was unable to eat his dinner. Benjamin was given crackers and a sack lunch, encouraged to eat small amounts, and given Pepto tabs before being returned to housing.  According to the RN, Benjamin's COWS score remained mild at only 6.

54.    At approximately midnight, Benjamin was seen again by an RN complaining of 10/10 pain and no change since earlier.  Detention officers reported to the health staff that Benjamin was vomiting what looked like water and bile.  Benjamin's heart rate was elevated at 140 beats per minute.  The RN reported their findings to the PA whose only intervention was to order the RN to check on the patient in the early morning.

55.    On or about July 7, 2022 at 4:30 a.m., Benjamin was seen again by RN staff. He continued to complain of "bone pain" and "all around" pain of 8-10/10 and throwing up all night.  Benjamin denied that any medications were helping.  Benjamin continued to have an elevated heart rate, had an abnormally low blood pressure of 80/56, and a slightly elevated respiration rate.

56.    The RN notified the PA of Benjamin's presentation, including his abnormal vital signs.  The PA issued no new orders and advised RN to have Benjamin in the clinic by the time the doctor arrived for further evaluation.  The RN also called the doctor but was unable to reach them and unable to leave a voice message.  Once again, Benjamin was returned to FSPC's general population.

57.    At approximately 8:00 a.m., Benjamin was seen by the PA.  Benjamin's heart rate and blood pressure remained abnormal and he was noted to be "ill-appearing" and complaining of 8/10 pain.  The PA administered 2 liters of normal saline and gave Benjamin a Boost nutritional supplement.

58.    At approximately noon on July 7, 2022, Benjamin was evaluated for transfer to CAFCC.  Benjamin was not cleared for travel due to COVID-19 exposure and was required to quarantine for 10 days.

59.   Nevertheless, the ERO transferred Benjamin to CAFCC for long-term housing.

**B.    Defendants Failed to Care for Benjamin at CAFCC.**

60.   At approximately 5:16 p.m. on July 7, 2022, Benjamin arrived at CAFCC. According to the transporting officers, Benjamin complained constantly of abdominal pain and had difficulty standing.

61.   At approximately 7:18 p.m., Receiving and Discharge Officer called medical staff and reported that Benjamin was "laying on the floor in the fetal position."

62.   At approximately 11:30 p.m., Benjamin was seen for an initial intake screening where he had an elevated blood pressure of 134/107, a heart rate of 122 beats per minute, and complaining of 10/10 generalized pain.  Other detainees reported that Benjamin was vomiting a black substance into the trash can.

63.   At approximately 12:03 a.m. on July 8, 2022, the RN contacted the NP who ordered Benjamin to be admitted to medical observation.

64.   At approximately 12:46 a.m., other detainees notified the RN that Benjamin had vomited a dark-brown fluid in the bathroom trash can.  The RN completed a visual inspection of the trash cans in the waiting area but did not immediately notify the NP that Benjamin had vomited or its appearance.

65.   At 1:05 a.m., Benjamin collapsed, striking his forehead in the process causing a deep laceration on his forehead.  He became unresponsive and a code was called at 1:10 a.m.  At 1:14 a.m., emergency-911 was called and Benjamin was noted to have dark fluid leaking from his mouth.

66.   CAFCC administered a total of five doses[4] of Narcan and started chest compressions but Benjamin never regained consciousness.  Benjamin was pronounced dead at 1:41 a.m. on July 8, 2022.

**C.    Defendants Sent Representatives to Benjamin's Autopsy.**

---

[4] The Mortality Review (defined below) and medical records disclosed by the United States indicate that Benjamin received five doses of Narcan, while the Death Report (defined below) disclosed by the United States indicates he received four.

67.     Fearing their liability, CoreCivic and the United States sent representatives to Benjamin's autopsy.

68.     The United States sent Detective D. Helsdingen, and CoreCivic sent Investigators D. Garcia and G. Wilson.

69.     Pinal County Medical Examiner ("Medical Examiner") Andrea L. Wiens, D.O., conducted the autopsy on July 8, 2022, and issued a report on August 15, 2022.

70.     The Medical Examiner concluded the cause of death was spontaneous bacterial peritonitis ("SBP")—an infection of ascites fluid in Benjamin's abdomen and not, as CoreCivic employees claimed, a drug overdose.

71.     Although Defendants' employees and agents claimed to have conducted abdominal examinations on Benjamin, none of them noted the 3,600 mL (nearly one gallon) of abdominal ascites the Medical Examiner found in Benjamin.

**D.     ICE's Detainee Death Report**

72.     Following Benjamin's death, the U.S. Immigration and Customs Enforcement Office of Professional Responsibility ("ICE-OPR") investigated and produced a Detainee Death Review Report ("Death Report").

73.     Through a Freedom of Information Act ("FOIA") request, Plaintiff's counsel obtained a redacted copy of the Death Report from the United States on May 15, 2023.

74.     The redacted Death Report does not show the names of any of the healthcare providers who saw Benjamin at FSPC or CAFCC, or the individuals who were interviewed during ICE-OPR's investigation.

75.     The Death Report documented several violations of policy, protocol, and/or procedure at both FSPC and CAFCC ("Death Report Violations"), including:

      i.     The failure to test Benjamin for TB during his entire time at FSPC;

      ii.    The RN who prepared the Transfer Summary for Benjamin's transfer from FSPC to CAFCC on July 7, 2022, did not pass along important information in writing to the RN at CAFCC about Benjamin's condition;

iii.   The RN at CAFCC who received a call from the RN at FSPC about Benjamin's transfer did not relay that information to her replacement at shift change;

iv.   An RN at FSPC marked Benjamin as not medically cleared for travel due to COVID-19 exposure, but ICE overruled that decision and transferred him anyway;

v.   Staff at CAFCC failed to document whether they checked on Benjamin after he had been transferred and placed in the facility's holding cell on July 7, 2022, and they failed to conduct irregular security checks;

vi.   After officers at CAFCC notified medical staff that Benjamin was in serious distress, an RN came to evaluate Benjamin, but did not have a working translation device;

vii.   Medical staff at CAFCC failed to conduct an "Off the Bus" encounter with Benjamin on July 7, 2022, to evaluate whether he was medically stable to await full medical intake screening;

viii.   The intake officer at CAFCC did not speak Spanish, and did not complete Benjamin's admissions documents—leaving many sections blank or incomplete;

ix.   Although Benjamin arrived at CAFCC at approximately 5:16 p.m. on July 7, 2022, CAFCC medical staff did not begin his medical intake screening until 11:24 p.m.;

x.   Staff at CAFCC failed to get Benjamin's general consent for treatment during the intake process; and

xi.   An RN at CAFCC learned from another detainee that Benjamin had vomited black fluid at approximately 12:44 a.m. on July 8, 2022, but did not investigate or order any medical interventions.

76.   The Death Report also noted that medical staff at CAFCC gave Benjamin

four doses of Narcan before he died, yet no contraband or drugs were ever found on Benjamin, and the Medical Examiner indicated that no drugs were found in Benjamin's system.

### E.    IHSC's Mortality Review

77.    Following Benjamin's death, a committee of ICE IHSC employees comprised of a Clinical Director, the Western Regional Advanced Practice Provider, an Advanced Practice Provider Reviewer, the IHSC Chief Nurse, the Central Regional Nurse Manager, Nurse Reviewers, a Risk Management Supervisory Nurse, and a Risk Management Reviewer (the "Mortality Review Committee") investigated and produced a "Mortality Review – Report of Findings" (the "Mortality Review").

78.    Through a FOIA request, Plaintiff's counsel obtained a redacted copy of the Mortality Review from the United States on May 15, 2023.

79.    The redacted Mortality Review does not show the names of any of the healthcare providers who saw Benjamin at FSPC or CAFCC, or the individuals who were interviewed during the investigation.

80.    The Mortality Review Committee documented several violations of policy, protocol, and/or procedure at both FSPC and CAFCC (the "Policy Violations"), including:

    i.    On July 2, 2022, FSPC nursing staff failed to document an assessment of Benjamin to justify a referral to a higher-level provider;

    ii.    On July 2, 2022, during Benjamin's initial physical examination at FSPC, the Advanced Practice Provider ("APP") did not order routine labs, as required by the clinical guidelines;

    iii.    On July 2, 2022, during Benjamin's initial physical examination at FSPC, the healthcare providers failed to consider differential diagnoses for Benjamin's severe symptoms—they only designated the opiate withdrawal diagnosis;

    iv.    Although IHSC policy requires the Clinical Director or a physician

14

designee to provide oversight and supervision to detainees with substance abuse issues, active intoxication, or medically supervised withdrawals, Benjamin's condition and care was not overseen by the Clinical Director or a physician designee;

v.  FSPC failed to initiate a medical hold for Benjamin, and ICE repeatedly transferred him to the Phoenix Field Office and to CAFCC during his opiate withdrawal monitoring;

vi.  On July 6, 2022, nursing staff did not document the use of the urgent emergent clinical nurse guidelines during Benjamin's emergency visits, which would have prompted health staff to consider referring him to the emergency department ("ED");

vii.  On July 6 and 7, 2022, Benjamin experienced signs and symptoms warranting referral to the ED; however, neither the physician nor the APP timely referred him to the ED;

viii.  On July 7, 2022, FSPC custody staff observed Benjamin with a trash bag containing dark brown emesis, but they did not notify the medical staff for further inspection/evaluation;

ix.  FSPC health staff sent CAFCC emails that contained inaccurate information regarding Benjamin's last fentanyl use, which resulted in confusion at CAFCC;

x.  On July 7, 2022, FSPC custody staff notified medical staff of Benjamin's continued complaint of abdominal pain; however, medical staff did not evaluate him immediately, and ICE transferred him to CAFCC prior to his scheduled appointment;

xi.  On July 7, 2022, prior to his CAFCC intake screening, Benjamin experienced signs and symptoms warranting immediate referral to the ED; however CAFCC did not call emergency medical services ("EMS") until almost two hours later;

FARHANG & MEDCOFF
ATTORNEYS

81. Defendants' employees, personnel, agents, and contractors committed these Policy Violations at FSPC and CAFCC.

82. Based on these violations, the Mortality Review Committee reached several key findings (the "Mortality Review Findings"), including:

  i.   Benjamin's medical care at FSPC and CAFCC was not provided within the safe limits of practice;

  ii.  FSPC did not provide medical care in accordance with IHSC policy and clinical guidelines;

  iii. FSPC did not timely refer Benjamin to the ED;

  iv.  FSPC custody staff did not communicate pertinent information to the medical department;

  v.   CAFCC did not timely refer Benjamin to the ED; and

  vi.  CAFCC medical staff inconsistently reviewed written critiques of man-down drills.

83. The Mortality Review Committee indicated personnel at FSPC and CAFCC failed to meet several rules, policies, and standards, including:

  A.   PBNDS Part 4.3, Section K, *Substance Dependence and Detoxification*;

  B.   PBNDS Part 4.3, Section N, *Medical/Psychiatric Alerts and Holds*;

  C.   NCHC J-F-04, *Medically supervised withdrawal and treatment*;

  D.   ICHS Policy Directive 03-13, 2021, *Detainees with substance use, intoxication, and withdrawal*;

  E.   Federal Bureau of Prisons Clinical Guidance, 2020, Medically *Supervised Withdrawal for Inmates with Substance Use Disorders*;

  F.   PBNDS Part 4.3, Section T, *Emergency Medical Services and First Aid*;

  G.   IHSC Policy: Interim Reference Sheet for New Clinical Nursing Guidelines, Appendix B – Adult Urgent Emergent Clinical Nurse Guidelines, 2021,

*Abdominal Pain*;

    H.  PBNDS (2008) Part 4, Section O, *Emergency Medical Services and First Aid*;

    I.  CAFCC Policy 13-34, *Medical Emergency Response*;

    J.  PBNDS Part 4.3, Section Z, *Continuity of Care*;

    K.  PBNDS Part 7.4, Section C, *Responsibilities of the Health Care Provider at the Sending Facility*; and

    L.  NCCHC J-E-07, *Nonemergency Health Care Requests and Services*;

    M.  NCCHC J-D-07, *Emergency Services and Response Plan*.

  **F.**  **Defendants Should Have Referred Benjamin to the ED for Life-Saving Care.**

84. On at least five separate occasions, Defendants failed to recognize clear signs that Benjamin was experiencing a medical emergency that required care and expertise beyond the abilities and scope of practice of the personnel at FSPC and CAFCC.

85. The United States and STG should have referred Benjamin to the ED no later than July 6, 2022, at 1:55 p.m.  At that time, Benjamin had an abnormal blood pressure, and complained of 20/10 abdominal pain, nausea, vomiting, and an inability to eat. Despite Benjamin's abnormal blood pressure and intense pain and vomiting, ICE and STG failed to refer him to the ED or call EMS.

86. The United States and STG should have referred Benjamin to the ED on July 7, 2022, at 12:20 a.m.  At that time, Benjamin had a heart rate of 140 beats per minute, a blood pressure of 102/70, and complained of 10/10 abdominal pain, nausea, vomiting, and an inability to eat.  The RN who saw Benjamin contacted the PA about an urgent visit, but the PA never saw Benjamin, and nobody referred him to the ED or called EMS.

87. The United States and STG should have referred Benjamin to the ED on July 7, 2022, at 5:18 a.m.  At that time, Benjamin had a heart rate of 128 beats per minute, a blood pressure reading of 80/56, and complained of 10/10 abdominal pain, vomiting, and an inability to eat.  The RN who saw Benjamin contacted the PA and the Clinical Director

to report Benjamin's rapidly deteriorating condition, but nobody referred Benjamin to the ED or called EMS. Instead, the PA advised the RN to have the Clinical Director see Benjamin by 6:00 a.m. Despite this recommendation, neither the Clinical Director nor any other M.D. saw Benjamin.

88. The United States and STG should have referred Benjamin to the ED on July 7, 2022, at 7:54 a.m. At that time, Benjamin had a heart rate of 137 beats per minute, *could not produce a blood pressure reading*, appeared uncomfortable and ill, and complained of severe pain, nausea, vomiting, and chills. Despite these severe vitals and symptoms, the PA failed to refer Benjamin to the ED or call EMS.

89. Finally, as noted by the Mortality Report Committee, "[o]n July 7, 2022, during his CAFCC intake screening, Mr. Gonzalez-Soto experienced signs and symptoms warranting immediate referral to the ER; however, CAFCC did not call EMS until almost two hours later." At 11:30 p.m. on July 7, 2022, Benjamin had a heart rate of 122 beats per minute, a blood pressure reading of 134/107, appeared ill, and complained of 10/10 abdominal pain. Despite this, CAFCC and Does 1-10 failed to refer Benjamin to the ED or call EMS. He died two hours later.

### G. The United States and STG Should Not Have Transferred Benjamin to CAFCC.

90. The United States and STG should not have transferred Benjamin from FSPC to CAFCC on July 7, 2022.

91. The United States and STG should have placed a medical hold on Benjamin at FSPC due to his withdrawal.

92. Given that Benjamin had not been medically cleared for transfer from FSPC to CAFCC due to COVID-19 exposure, the United States and STG should not have permitted Benjamin's transfer to CAFCC.

93. The United States and STG nonetheless authorized Benjamin's transfer to CAFCC, a facility with a known history of fatal health outcomes.

94. For example, in just the twelve-month period from August 2021 to August

2022, ten (10) detainees died at CAFCC.[5]

95.    CAFCC's history of adverse health outcomes (including death) was no surprise to the United States, yet it ignored a COVID-19 hold and sent Benjamin to CAFCC anyways.

**H.    The United States Owed Benjamin a Non-Delegable Duty of Care**

96.    "Arizona law recognizes that public policy requires a duty of care 'in situations involving involuntary detainment or commitment.'" *J.P. v. United States*, No. CV-22-00683-PHX-MTL, 2023 WL 4237331, at *12 (D. Ariz. June 28, 2023) (quoting *Harrelson v. Dupnik*, 970 F.Supp.2d 953, 974 (D. Ariz. 2013)); *see also Gilbert v. La Paz Cnty.*, No. CV1801792-PHX-DGC-DMF, 2020 WL 2064099, at *13 (D. Ariz. Apr. 29, 2020) ("Arizona has recognized that a duty to protect exists in certain special relationships such as guardian-ward and jailer-prisoner.").

97.    "Like a jailor-prisoner relationship, federal immigration officials owe a duty of care to noncitizens that they detain and hold in custody." *C.M. v. United States*, No. CV-19-05217-PHX-SRB, 2023 WL 7102132, at *15 (D. Ariz. Oct. 24, 2023).

98.    The United States, through ICE, owns and operates FSPC, where it detains immigrants like Benjamin.

99.    The United States, through IHSC, is responsible for providing medical care services at FSPC to detainees like Benjamin.

100.    The United States is responsible for ensuring that the operation, maintenance, and medical care services at FSPC comply with laws, rules, regulations, and standards like the PBNDS and NCCHC Standards.

101.    The United States monitors and enforces compliance with these laws, rules, regulations, and standards at FSPC by, among other things, maintaining final authority over the services and care provided to detainees, supervising United States and contract

---

[5] *See* CAFCC Facility Inspection Cover Letter, Annual Inspection of the CAA Florence Correctional Center, U.S. Immigration and Customs Enforcement (Aug. 25, 2022), available at https://www.ice.gov/doclib/facilityInspections/CCAFLAZ22-CL-08-25-2022.pdf (last accessed May 16, 2024) ("In the past twelve months, ten detainees have died at the facility.").

personnel in detention centers, making unannounced compliance inspections, investigating deaths in detention centers and producing Detainee Death Review Reports and Mortality Reviews, and preparing Annual Inspection Reports.

102. The United States accordingly retains control and management authority over STG's medical services at FSPC by, among other things, retaining final control and authority over the services and care provided to detainees, supervising STG's operations, and requiring that STG's medical services comply with all applicable laws, rules, regulations, and standards like PBNDS and NCCHS Standards.

103. The United States, through ICE, oversees the operation and management of CAFCC.

104. The United States assigned deportation officers and a detention cervices manager to CAFCC to oversee the management and operation of CAFCC and ensure compliance with laws, rules, regulations, and standards like the PBNDS and NCCHS Standards.

105. The United States monitors compliance with these laws, rules, regulations, and standards at CAFCC by, among other things, retaining final control and authority over the services and care provided to detainees, supervising the operations of CoreCivic and Does 1-10 at CAFCC, conducting unannounced compliance inspections, investigating deaths and preparing Detainee Death Review Reports and Mortality Reviews, and preparing Annual Inspection Reports.

106. The United States accordingly retains control over the management and operation of CAFCC by, among other things, requiring that CoreCivic and Does 1-10 comply with all applicable laws, rules, regulations, and standards like PBNDS and NCCHS Standards.

107. The United States has a duty to care for the health and well-being of individuals detained at FSPC and CAFCC. *See C.M. v. United States*, No. CV-19-05217-PHX-SRB, 2023 WL 7102132, at *15 (D. Ariz. Oct. 24, 2023); *J.P. v. United States*, No. CV-22-00683-PHX-MTL, 2023 WL 4237331, at *12 (D. Ariz. June 28, 2023).

108.  The United States had a non-delegable duty—and did not fully delegate its duty—to care for the health and well-being of Benjamin at FSPC and CAFCC.  *See Edison v. United States*, 822 F.3d 510, 523 (9th Cir. 2016); *see., e.g.*, *Wagner v. State*, 242 Ariz. 95, 98 (Ct. App. 2017).

109.  The United States breached this duty when, among other things, it:

    i.    Failed to ensure personnel at FSPC and CAFCC followed all applicable laws, rules, polices, regulations, and standards, resulting in the Death Report Violations and the Policy Violations;

    ii.    Failed to ensure Benjamin received adequate medical care at FSPC and CAFCC;

    iii.    Failed to ensure personnel at FSPC provided medical care in accordance with IHSC policy and clinical guidelines;

    iv.    Failed to ensure personnel at FSPC timely refer Benjamin to the ED;

    v.    Failed to ensure personnel at FSPC communicated crucial information to the medical department;

    vi.    Failed to place a medical hold on Benjamin at FSPC, overlooked the fact that he had not been medically cleared for transfer to CAFCC, and authorized his transfer to CAFCC;

    vii.    Failed to ensure personnel at CAFCC timely referred Benjamin to the ED; and

    viii.    Failed to give Benjamin an opportunity for life-saving emergency medicine when he needed it most.

110.  It was foreseeable that these breaches—namely, the repeated failures to follow the PBNDS and NCCHS Standards, the repeated failures to consider differential diagnoses, the repeated failures of both lower and higher-level provides to recognize Benjamin's severe condition, the repeated failures to refer Benjamin to the ED, and the improper transfer of Benjamin to CAFCC—would cause a significantly adverse health outcome.

111.  Stated differently, it was foreseeable that these breaches would (or could) proximately cause Benjamin's wrongful death by depriving him of multiple opportunities for life-saving medical care.

112.  It was foreseeable that these breaches—alone and in combination—would (or could) be a substantial factor in causing Benjamin's wrongful death.

113.  In fact,[6] these breaches did proximately cause Benjamin's wrongful death because they deprived him of multiple opportunities for life-saving medical care.

114.  In fact, these breaches, both alone and in combination, were a substantial factor in causing Benjamin's wrongful death.

115.  Absent these breaches, Benjamin would have received life-saving medical care, and he would have survived.

116.  Absent these breaches, Benjamin would not have died a painful and terrifying death—he would be home in Mexico recovering with the love and support of his family.

**I.    STG, CoreCivic, and Does 1-10 Owed Benjamin the Duty of Care**

117.  "Arizona law recognizes a duty arising from 'special relationships such as guardian-ward and jailer-prisoner.'"  *C.M. v. United States*, No. CV-19-05217-PHX-SRB, 2023 WL 7102132, at *15 (D. Ariz. Oct. 24, 2023) (quoting *Gilbert v. La Paz County*, No. CV 18-01792-PHC-DGC (DMF), 2020 WL 2064099, at *13 (D. Ariz. Apr. 29, 2020)); *see also* Restatement (Second) of Torts § 314A(4) (1965) ("One who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection is under a similar duty to the other.").

118.  This duty of care exists in the special relationship between healthcare providers in detention centers and detainees.  *See Wertheim v. Pima Cnty.*, 211 Ariz. 422, 424-25 (Ct. App. 2005); *see also, e.g.*, *DeMontiney v. Desert Manor Convalescent Ctr.*

---

[6] *See Gipson v. Kasey*, 214 Ariz. 141, 143 (2007) (explaining "breach and causation, are factual issues usually decided by the jury.").

*Inc.*, 144 Ariz. 6, 11, 695 P.2d 255, 260 (1985).

119.   As healthcare providers for Benjamin at FSPC and CAFCC, STG, and Does 1-10 owed Benjamin a duty of care.

120.   Similarly, as the guardian and/or jailer of Benjamin at CAFCC, CoreCivic owed him a duty of care. *Accord Lopez v. CoreCivic*, Case No. 2:19-cv-4332-ROS, Doc. 68 ¶ 50 ("CoreCivic admits that it had a duty to act reasonably with respect to the safety and security of the decedent."), Doc. 68 ¶ 51 ("it is admitted that CoreCivic was required to follow applicable ICE PBNDS standards."); Doc. 194 at 15 ("As a provider of immigration detention services, CoreCivic's duty, if any, under the common law was to exercise ordinary care in providing reasonably safe conditions and access to medical care.").

121.   Under the ICE-STG Agreement, STG agreed to provide medical services to individuals at FSPC, like Benjamin.

122.   STG agreed to provide adequate medical services that met all applicable laws, rules, regulations, and standards like the PBNDS and NCCHS Standards.

123.   Once STG began to provide medical services to Benjamin, STG assumed a duty of care.

124.   Under the agreements they signed with CoreCivic, Does 1-10 agreed to provide medical services to individuals at CAFCC, like Benjamin.

125.   Does 1-10 agreed to provide adequate medical services that met all applicable laws, rules, regulations, and standards like the PBNDS and NCCHS Standards.

126.   Once Does 1-10 began to provide medical services to Benjamin, they assumed a duty of care.

127.   CoreCivic and Does 1-10 breached the duties they owed Benjamin when they, among other things:

       i.     Failed to ensure personnel at CAFCC followed all applicable laws, rules, polices, regulations, and standards, resulting in the Death Report Violations and the Policy Violations;

ii.    Failed to ensure Benjamin received adequate medical care at CAFCC;

iii.   Failed to ensure personnel at CAFCC timely referred Benjamin to the ED; and

iv.    Failed to give Benjamin an opportunity for life-saving emergency medicine when he needed it most.

128.   Similarly, STG breached the duties it owed Benjamin when it, among other things:

i.     Failed to ensure personnel at FSPC followed all applicable laws, rules, polices, regulations, and standards, resulting in the Death Report Violations and the Policy Violations;

ii.    Failed to ensure Benjamin received adequate medical care at FSPC;

iii.   Failed to ensure personnel at FSPC provided medical care in accordance with IHSC policy and clinical guidelines;

iv.    Failed to place a medical hold on Benjamin at FSPC;

v.     Failed to ensure personnel at FSPC timely refer Benjamin to the ED; and

vi.    Failed to give Benjamin an opportunity for life-saving emergency medicine when he needed it most.

129.   It was foreseeable that these breaches—namely, the repeated failures to follow the PBNDS and NCCHS Standards, the repeated failures to consider differential diagnoses, the repeated failures of both lower and higher-level provides to recognize Benjamin's severe condition, and the repeated failures to refer Benjamin to the ED—would cause a significantly adverse health outcome.

130.   Stated differently, it was foreseeable that these breaches would (or could) proximately cause Benjamin's wrongful death by depriving him of multiple opportunities for life-saving medical care.

131.   It was foreseeable that these breaches—alone and in combination—would

(or could) be a substantial factor in causing Benjamin's wrongful death.

132.  In fact, these breaches did proximately cause Benjamin's wrongful death because they deprived him of multiple opportunities for life-saving medical care.

133.  In fact, these breaches, both alone and in combination, were a substantial factor in causing Benjamin's wrongful death.

134.  Absent these breaches, Benjamin would have received life-saving medical care, and he would have survived.

135.  Absent these breaches, Benjamin would not have died a painful and terrifying death—he would be home in Mexico recovering with the love and support of his family.

## COUNT I – NEGLIGENCE/WRONGFUL DEATH

**(Against the United States pursuant to 28 U.S.C. § 2674, and against CoreCivic, STG, and Does 1-10 pursuant to A.R.S. § 12-611)**

136.  Plaintiff re-alleges and incorporates by reference all allegations in the preceding paragraphs.

137.  The United States was responsible for Benjamin's custody and care from July 1, 2022, until his death on July 8, 2022.

138.  The United States owed Benjamin the duty of care from July 1, 2022, until his death on July 8, 2022.

139.  The United States did not delegate—and could not delegate—the duty of care it owed Benjamin at FSPC and CAFCC.

140.  The United States breached this duty when, among other things, it:

    i.    Failed to ensure personnel at FSPC and CAFCC followed all applicable laws, rules, polices, regulations, and standards, resulting in the Death Report Violations and the Policy Violations;

    ii.    Failed to ensure Benjamin received adequate medical care at FSPC and CAFCC;

    iii.    Failed to ensure personnel at FSPC provided medical care in

FARHANG & MEDCOFF
ATTORNEYS

accordance with IHSC policy and clinical guidelines;

iv.    Failed to ensure personnel at FSPC timely refer Benjamin to the ED;

v.    Failed to ensure personnel at FSPC communicated crucial information to the medical department;

vi.    Failed to place a medical hold on Benjamin at FSPC, overlooked the fact that he had not been medically cleared for transfer to CAFCC, and authorized his transfer to CAFCC;

vii.    Failed to ensure personnel at CAFCC timely referred Benjamin to the ED; and

viii.    Failed to give Benjamin an opportunity for life-saving emergency medicine when he needed it most.

141.  STG was responsible for Benjamin's care from July 1, 2022, until July 7, 2022.

142.  STG owed Benjamin the duty of care from July 1, 2022, until July 7, 2022.

143.  STG breached this duty when it, among other things:

i.    Failed to ensure personnel at FSPC followed all applicable laws, rules, polices, regulations, and standards, resulting in the Death Report Violations and the Policy Violations;

ii.    Failed to ensure Benjamin received adequate medical care at FSPC;

iii.    Failed to ensure personnel at FSPC provided medical care in accordance with IHSC policy and clinical guidelines;

iv.    Failed to place a medical hold on Benjamin at FSPC;

v.    Failed to ensure personnel at FSPC timely referred Benjamin to the ED; and

vi.    Failed to give Benjamin an opportunity for life-saving emergency medicine when he needed it most.

144.  CoreCivic and Does 1-10 were responsible for Benjamin's custody and care from July 7, 2022, until his death on July 8, 2022.

26

145.   CoreCivic and Does 1-10 owed Benjamin the duty of care from July 7, 2022, until his death on July 8, 2022.

146.   CoreCivic and Does 1-10 breached the duties they owed Benjamin when they, among other things:

    i.    Failed to ensure personnel at CAFCC followed all applicable laws, rules, polices, regulations, and standards, resulting in the Death Report Violations and the Policy Violations;

    ii.    Failed to ensure Benjamin received adequate medical care at CAFCC;

    iii.    Failed to ensure personnel at CAFCC timely referred Benjamin to the ED; and

    iv.    Failed to give Benjamin an opportunity for life-saving emergency medicine when he needed it most.

147.   It was foreseeable that Defendants' breaches would (or could) cause an adverse health outcome to Benjamin, including his death.

148.   It was foreseeable that Defendants' breaches—alone and in combination—would (or could) be a substantial factor in causing Benjamin's wrongful death.

149.   These breaches proximately caused Benjamin's wrongful death because they deprived him of multiple opportunities for life-saving medical care.

150.   These breaches, both alone and in combination, were a substantial factor in causing Benjamin's wrongful death.

151.   Absent these breaches, Benjamin would have received life-saving medical care, and he would have survived.

152.   Absent these breaches, Benjamin would not have died a painful and terrifying death—he would be home in Mexico recovering with the love and support of his family.

153.   Plaintiff and the statutory beneficiaries she represents have been damaged in an amount to be proven at trial, including, but not limited to: (i) the loss of Benjamin's

prospective earning capacity and associated financial support; (ii) the loss of Benjamin's companionship, comfort, love, affection, guidance, and society; and (iii) pain, anguish, suffering, and sorrow.

154. The conduct of the employees, agents, and contractors of Defendants CoreCivic, STG, and Does 1-10 was intentional, malicious, wanton, oppressive, and/or exhibited a deliberate and conscious disregard for Benjamin's rights and life, and should be punished with an award of punitive damages.

155. Defendants are vicariously liable for the acts and omissions of their various employees, agents, contractors, and agencies.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff requests entry of judgment in her favor and against all Defendants as follows:

A.    For compensatory damages against all Defendants, in an amount to be proven at trial;

B.    For exemplary and punitive damages against STG, CoreCivic, and Does 1-10;

C.    For pre- and post-judgment interest against STG, CoreCivic, and Does 1-10 at the maximum legal rate;

D.    For such further relief as the Court deems just, proper, and appropriate.

/ / / /

/ / / /

/ / / /

/ / / /

/ / / /

/ / / /

/ / / /

/ / / /

## JURY DEMAND

Plaintiff hereby demands that the claims against STG, CoreCivic, and Does 1-10 be tried before a jury.

DATED this 15th day of July 2024.

/s/ *Rocío Castañeda Acosta*

Laura Belous
Rocío Castañeda Acosta
**FLORENCE IMMIGRANT & REFUGEE RIGHTS PROJECT**
P.O. Box 86299
Tucson, AZ 85754
Telephone: 520-934-7257
*Attorneys for Plaintiff*

/s/ *Tyler B. Bugden*

Adam T. Peterson
Tyler B. Bugden
**FARHANG & MEDCOFF**
100 South Church Avenue, Suite 100
Tucson, AZ 85701
Telephone: 520-214-2000
**Attorneys for Plaintiff**